UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES GRIGSBY

                Plaintiff,                Case No. 06-11171

vs.                                DISTRICT JUDGE SEAN F. COX
                                MAGISTRATE JUDGE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**

## I.    BACKGROUND

Charles Grigsby brought this action under 42 U.S.C. §405(g) and §1383(c)(3) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment. Plaintiff has filed an additional motion requesting a remand based upon new evidence. These matters have been referred for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C).  For the following reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED, Plaintiff's Motion for Remand be GRANTED so that a determination can be made which includes consideration of the new evidence and Plaintiff's Motion for Summary Judgment be GRANTED IN PART with the Commissioner being instructed to perform a more thorough credibility determination in accordance with SSR 96-7p.

A.      **Procedural History**

Plaintiff filed an application for DIB and SSI on March 10, 2003, alleging disability beginning May 14, 2001, due to "back surgery, 2 knee surgury (sic), replaced arteries @ the aorta and both groins – had no blood flow, learning disability – reading and writing" (R. 54-57, 72, 284-87).  Following a May 11, 2005, hearing, Plaintiff's application was denied (R. 25).  The Appeals Council denied Plaintiff's request for review (R. 7-9).

On July 30, 2006, Plaintiff's subsequent application for DIB was approved with a disability onset date of July 1, 2006 (Dkt. #13, Exh. A).  This decision is not before the Court for review, but Plaintiff argues for a remand so that the evidence submitted to support the subsequent application, namely treatment (including surgery) received after the hearing date at issue here, can be considered on the prior denial.

B.      **Background Facts**

1.      ***Plaintiff's Hearing Testimony***

Plaintiff was 49 years old, 5'8" tall and weighed 240 pounds at the time of the hearing (R. 310).  He finished the twelfth grade and had no other schooling or vocational training (R. 312).  He could read a "little bit" and his writing was "real poor".[1]

His last employment was with Great Lakes Compression as a pipe fitter, a position he held from January 2001 until June 2001 and then again in June 2002, at which time he was laid off (R.

----

[1] Plaintiff's wife completed his social security applications for him, he was not able to read a newspaper and could not multiply or divide well (R. 326).  He did pass his written driver's test (R. 337).

312-13).[2]  Great Lakes Compression had purchased his previous employer, Dominion Exploration, where he had worked as a pipe fitter for six years (R. 313).  Before this he worked for Midwest Development Corporation as a pipe fitter and Render Building as a warehouse worker (R. 314).

Plaintiff had back surgery in 2001, which alleviated his symptoms somewhat but his condition still "bothered him" (R. 324-25).  Plaintiff felt he could not work due to back pain, which was exacerbated with extended sitting, standing or walking (R. 315).  He could walk approximately 200-300 feet before stopping due to pain in his back and legs (R. 323).  He experienced numbness in his legs and sharp pains down his left side.  He took pain medication twice a week (R. 316).  The medication alleviated his pain, but caused nausea and drowsiness (R. 315).  Sitting in a recliner also relieved his pain (R. 322).  He had a steady 5 or 6/10 state of pain which increased to 7 or 8/10 with activity (R. 321).  Plaintiff had no current "mental problems" and did not see a psychologist, psychiatrist or counselor (R. 316), but he did take an anti-depressant every other day (R. 322).

Plaintiff smoked a pack and a half of cigarettes per day (R. 318).  Plaintiff's typical day consisted of sitting in recliner, watching television, trying to do dishes (if he was able to stand long enough), taking a nap around 10:00 a.m., trying to walk around "a little bit", take another nap around 2:00 or 3:00 and trying to "do a few things" (R. 317).  He took naps because he did not sleep well at night due to his inability to "get comfortable" (R. 317-18).  The naps were typically 20-30 minutes long (R. 318).  He was able to grill "occasionally", but did not do actual cooking.  He could start laundry, but could not take the clothes out because they were too heavy and picking them up caused

---

[2] Plaintiff explained that he left work in 2001 due to "back problems" and indicated that he never actually returned in 2002 (R. 323-24).  Apparently he informed his employer that his doctor had authorized his return to work and when he returned on the following Monday, he was laid off (R. 325).

3

back pain.  He could not shop for groceries because walking caused back pain, but he could shop for single items at the convenience store.

Plaintiff did not read newspapers or magazines; did not belong to any groups, organizations or clubs and did not visit family and friends unless they came to him (R. 319).[3]  Plaintiff drove three to four times per week.  Plaintiff as able to mow his lawn with a riding lawn mower, though he needed to take breaks (R. 320).  He was able to bathe and dress himself.  Plaintiff did not know how to use the Internet or e-mail (R. 321).

## 2.    *Medical Evidence*

### Evidence Available at May 2005 ALJ Hearing

On February 1, 2001, Plaintiff reported hip pain to Dr. McNamara which had gotten progressively worse in the last six months.  It was caused by walking and, for the past one and a half weeks, was accompanied by tingling in his left leg (R. 186).  Sitting relieved the pain.  On February 15, 2001, Plaintiff reported back and hip pain without much improvement.  A February 16, 2001, lumbrosacral spine x-ray revealed degenerative changes (R. 190).

On March 8, 2001, Plaintiff reported to Dr. McNamara that his back pain was exacerbated with activity and he had good days and bad days (R. 185).  On March 21, 2001, Plaintiff completed a 12 session program of physical therapy (R. 131).  He was reported as having reduced pain of 0/10 except when walking, which raised the pain level to 4/10.  His range of motion was improved and his strength and function were unchanged.  His potential was described as good to excellent and the therapist recommended continued therapy for three to four weeks.

---

[3] His mother lived 150 miles away from him and he had visited her twice since his back surgery because the two and half hour car ride bothered him too much (R. 327).

4

On March 31, 2001, Plaintiff was seen in the emergency room complaining of left upper abdominal pain (R. 135). Plaintiff was diagnosed with a right ear infection and questionable pleurisy.

On April 5, 2001, Dr. McNamara rechecked Plaintiff for back pain and Plaintiff reported that his left leg was still going numb (R. 184). An April 19, 2001, lumbar spine MRI revealed moderate L2-5 degenerative disc disease, circumferentially bulging disc as well as moderate posterior midline and bilateral paracentral L4 disc herniation with highly probable bilateral nerve root impingement (R. 189). Dr. McNamara referred Plaintiff to Dr. Louis Habryl for lumbar back pain with radiculopathy (R. 137, 184).

On May 14, 2001, Dr. Habryl examined Plaintiff upon referral from Dr. McNamara (R. 166). Dr. Habryl reviewed an MRI conducted at Otsego Memorial Hospital on April 19, 2001 (R. 189), and concluded that Plaintiff suffered from lumbar spinal stenosis secondary to disc herniation at L4-5 and disc degeneration at L2-5. On May 21, 2001, Plaintiff was diagnosed with degenerative disc disease with lumbar radiculopathies and was treated with a steroid epidural injection (R. 138, 140).

On May 18, 2001, Dr. Habryl noted that Plaintiff's MRI demonstrated lumbar disc herniation at 4-5 and disc degeneration at L3-4 and 5-1 (R. 165). Her impression was lumbar spinal stenosis secondary to disc herniation at L4-5 and mild to moderate degenerative changes. Dr. Habryl administered an epidural injection (R. 165).

On June 11, 2001, Dr. Habryl noted that the epidural injection had little to no effect and Plaintiff was continuing to have pain extending to both legs, worse on the left, with numbness and tingling extending to the left foot (R. 184). A neurological exam was described as "not very dramatic" with some weakness of the left extensor. Dr. Habryl ordered a myelogram and CAT scan

5

to evaluate nerve root impingement.

A July 10, 2001, x-ray myelogram revealed posterior herniation of discs at L4-5 and L3-4 and degenerative disc material at both levels (R. 142). On July 16, 2001, Dr. Habryl noted that Plaintiff had considerable nerve root impingement and stenosis at L3-4 and 4-5 and a very large disc herniation and stenosis at L4-5 and moderate at 3-4. His reflexes were active but his extensor was weak on the left. SLR was positive and Plaintiff had a lot of clauditory pain. Dr. Habryl discussed the option of a lumbar laminectomy and decompression.

On August 10, 2001, Plaintiff underwent a bilateral lumbar laminectomy at L3-4 and L4-5 with two level decompression at L3-4 and L4-5, and a foraminotomy and discectomy at L4-5 (R. 15-52). Plaintiff was discharged on August 11, 2001, with instructions for no lifting or driving, but no restrictions on walking or diet (R. 151).

On August 22, 2001, Plaintiff reported doing "quite well" and being able to walk longer distances since his surgery (R. 163). On September 20, 2001, Plaintiff reported doing reasonably well (R. 163). His range of motion and leg pain were improved, but he had not "attained anywhere near a full ROM" and had not been doing resistant exercises. Dr. Habryl recommended continued supervised physical therapy and a one month follow-up exam.

On October 17, 2001, it is noted that Plaintiff continued to experience back pain and left buttock pain but had experienced improvement in his leg pain (R. 162). Dr. Habryl noted improvement in Plaintiff's pain with stretch signs, improved extensor strength and symmetrical and strong reflexes. Dr. Habryl felt that Plaintiff's neurological evaluation was improved. Spinal x-rays showed "AP and lateral demonstrating having a decompression beginning at L3 and extending to S1". There was no shift in the spine, no spondylolisthesis and no unusual scoliosis. Disc spaces

6

were maintained upon comparison to previous x-rays.  Dr. Habryl recommended Relafen, continued therapy and a return visit in one month.

On November 21, 2001, Dr. Habryl was concerned that Plaintiff was "developing some clauditory problems from a vascular origin."  Upon examination, Plaintiff had a slight diminished dorsal pedal pulse posterior tibial and good extensor strength (R. 162).  Dr. Habryl felt that Plaintiff's radicular symptoms were improved but opined that the clauditory symptoms may be from a vascular origin, and added that smoking would add to the "potential of this symptom complex".  Dr. Habryl ordered a vascular Doppler with arterial pressures and a recheck after the test had been completed.

On December 12, 2001, Dr. Habryl opined that Plaintiff may have arterial insufficiency and indicated that they were waiting for the results of a arterial venous Doppler test (R. 161).

The December 12, 2001, Doppler test performed by Dr. Andris Kazmers indicated that Plaintiff had severe aortoiliac occlusive disease, with marked falloff in high thigh pressures, abnormal femoral wave forms, indicating aortoiliac inflow disease.  Additional multisegmental disease was not obvious on this study, due to lack of significant falloff and pressures distal to the high thigh (R. 167).  Dr. Kazmers diagnosed Plaintiff with abdominal aortic occlusion and bilateral anterior tibial and posterior tibial artery occlusions with peroneal runoff to the feet (R. 182).

On January 14, 2002, Dr. Kazmers indicated that Plaintiff required extensive vascular evaluation for dizziness, claudication with aortoiliac occlusion and indicted that Plaintiff needed to quit smoking (R. 169).  Plaintiff reported that he was not able to walk more than one half of a block without experiencing pain in his buttocks and down both legs, and indicated similar limitations before his laminectomy.  Plaintiff was experiencing dizziness and arm numbness but no ischemic

rest pain in his feet.  Dr. Kazmers opined that Plaintiff had aorotic occlusion requiring surgery (R. 170).

A January 22, 2002, pulmonary study was within normal limits (R. 171).  A January 22, 2002, duplax scan revealed normal carotid and vertebral flow (R. 172).  A January 24, 2002 stress/rest adenosine gated sestamibi test revealed near normal resting perfusion, normal stress/rest myocardial perfusion and moderate inferolateral hypokinesis with normal remainder of left ventricular wall thickening and wall motion (R. 179).  A January 29, 2002, "aortography abdominal angio extremity bilateral" revealed abdominal aortic occlusion just below the inferior mesenteric artery origin with reconstitution at the iliac bifurcations and bilateral anterior tibial and posterior tibial artery occlusions with peroneal runoff to the feet (R. 182).  A February 4, 2002, chest x-ray revealed a bronchitic chest pattern (R. 195).  A February 5, 2002, left heart catherization and coronary artery study was normal (R. 191-93).  An abdominal echography completed on the same day revealed mild fatty infiltration of the liver and no evidence of ascites (R. 194).

On March 8, 2002, Bruce G. Douglass, Ph.D., completed the Psychiatric Review Technique form and concluded that Plaintiff had no medically determinable impairment (R. 199).

On April 4, 2002, Plaintiff was admitted for bilateral lower extremity claudication (R. 213). Plaintiff underwent thromboendarterectomy with a retroperitoneal aortobifemoral bypass graft on April 6, 2002.  Plaintiff's post-operative diagnosis was aortoiliac occlusive disease and lifestyle limiting claudication (R. 215).

On April 23, 2002, Plaintiff reported feeling good (R. 248).  A May 9, 2002, diagnostic consultation revealed that Plaintiff's ABI had doubled post-aortofemoral bypass (R. 245).

On June 27, 2003, Plaintiff underwent an independent medical evaluation by Dr. R. Scott

Lazzara, M.D. for the Disability Determination Service.  Plaintiff reported that he could do his activities of daily living, but required help in and out of the tub (R. 260).  Plaintiff also reported that he took no pain medication, other than an occasional aspirin, and did not use any assistive device. He did very little shopping or work around the house.  He could sit two hours, stand five to ten minutes and walk 30 feet.  He could lift five pounds occasionally and never greater than 25 pounds. Dr. Lazzara stated in his report that "the femoral, popliteal, dorsal pedis, and posterior tibial pulses are decreased on the right. . . . The feet are cold with decreased color" (R. 261).  There was no evidence of joint laxity, crepitance or effusion (R. 262).  There was pain and synovial thickening in both knees in the lateral menisci.  Grip strength remained intact, dexterity was unimpaired.  He could pick up a coin, button clothing and open a door.  Straight leg raising was negative bilaterally and there was no evidence of paravertebral muscle spasm.  He had mild difficulty getting on and off the exam table, heel and toe walking and squatting and moderate difficulty hopping.  His range of motion was within normal limits but mildly diminished.  Cranial nerves were intact, motor strength and tone were normal and senses were intact.  He walked with a normal gait and reflexes were within normal limits.  Dr. Lazzara concluded that Plaintiff was able to maintain a normal gait and walk without assistive devices despite knee pain; had no radicular symptoms or peri-incisional pain due to his back impairment, though his range of motion was mildly diminished and his claudication symptoms had been resolved post-aortic bi-femoral bypass (R. 263).  Dr. Lazzara also stated that Plaintiff "did have diminished pulsations in his right leg with diminished temperature indicative of possible re-occlusion."

In a July 7, 2003, Physical Residual Capacity Assessment Daniel Dolanski, D.O. opined that Plaintiff was able to lift 20 pounds occasionally and 10 pounds frequently and stand and/or sit six

hours in an eight hour workday (R. 265).  He was not able to constantly bend, kneel or twist and could occasionally climb, balance, stoop, kneel, crouch or crawl (R. 266).  No other limitations were described and Dr. Dolanski felt that, while Plaintiff's symptoms were attributable to a medically determinable impairment, the severity or duration were disproportionate to the expected severity or duration of the impairment (R. 269).

Plaintiff visited Dr. McNamara on June 5, 2003, to determine whether he was eligible for Veterans' Assistance benefits (R. 277); on December 1, 2003, complaining of pain/discomfort in left abdomen and side at previous incision site (R. 276); on January 6, 2004, reporting "still having pain in left side" (R. 275); and on July 20, 2004, complaining of pain in center of back and trouble sleeping (R. 274).  On March 21, 2005, the administrative agency received an undated and summary letter from Dr. McNamara indicating that Plaintiff was disabled from full-time sedentary work due to "well-documented post laminectomy syndrome and chronic back pain" (R. 273).

<u>New Evidence After the May 2005 ALJ Hearing Submitted for the District Court Review</u>

On August 26, 2005, Plaintiff reported lumbar back pain and was prescribed ibuprofen, 600 mg., to be taken three times a day and was advised to quit smoking and maintain a low fat diet (Exhibit B, Dkt. #13-3, pp. 3-4).  On September 2, 2005, Plaintiff was seen to have sutures removed from a hand injury and reported having "no major problems" (*Id.* at p. 5).  On September 15, 2005, Plaintiff reported pain in his right leg upon prolonged walking and indicated that he was having a compliance issue with his medications (*Id.* at p. 8).

On November 22, 2005, Plaintiff reported back "discomfort" (*Id.* at p. 12).  On November 25, 2005, Plaintiff reported that on November 4, 2005, he had developed back pain at a level of 5/10 which radiated down his right leg to his foot (*Id.* at p. 14).  Plaintiff was noted to be in moderate

10

discomfort.  The treator prescribed pain medication and ordered x-rays (*Id.* at p. 15).  November 26, 2005, lumbosacral x-rays revealed "(1) Disc disease in the form of osteophytes at multiple levels with disc space narrowing predominantly at L4-5, but mild.  (2) Facet joint disease at lower levels, particularly L4-5 and L5-S1 that could result in spinal canal and/or neural foraminal stenosis; however at L4 there appears to have been laminectomy which should alleviate any potential canal compromise or stenosis due to these changes" (*Id.* at p. 16).

On December 7, 2005, Plaintiff reported progressive back pain starting on Thanksgiving and noted pain on right hip and right side with prolonged walking (*Id.* at p. 17).  The treator ordered an MRI (*Id.* at p. 18).  The December 13, 2005, lumbar spine MRI revealed:

> 1. Diffuse degenerative changes of the lumbar spine noted with postsurgical change at L4-5.
> 2. Focus of low signal seen in the right neural foramen may represent focus of extruded disc. This may impress the exiting nerve root and should be correlated clinically though this appears to be slightly posterior and inferior to the nerve root.
> 3. Prominent facet arthropathy noted at the lower levels.
> 4. Constellation of degenerative changes including facet arthropathy and circumferential bulging of disc appears to produce a mild degree of central canal stenosis at the L3-4 level.

(*Id.* at p. 19).

Plaintiff was referred by Dr. Habryl to Dr. Michael D. Colburn, M.D. of Northwest Michigan Surgical Group & Vein Center on January 31, 2006.  Plaintiff reported that he had only 50% relief of symptoms after his back and vascular surgeries and that his pain had now gotten worse (Exhibit C, Dkt. #13-4).  He had been able to walk 100 feet without stopping after the surgery but now suffered pain and numbness in his right leg after walking only a few feet.  Upon physical examination Dr. Colburn noted that Plaintiff's extremities were cool and his right leg did not have a palpable femoral, popliteal, or pedal pulse.  On his left leg, there was a weak femoral pulse and

no palpable popliteal or pedal pulses.  Dr. Colburn opined in a letter to Dr. Habryl that Plaintiff continued to suffer "from severe peripheral vascular disease" (Exhibit D, Dkt. #13-5).

A February 7, 2006, "USV Lower Extremity Arterial Evaluation" revealed iliac stenosis on the right with diminished ankle brachial indices that further deteriorates after exercise, monophasic waveforms, and, on the left, no evidence of significant peripheral vascular occlusive disease (Exhibit F, Dkt. #13-7, p. 1).  A February 13, 2006, lower extremity MRA revealed that the left aortofemoral bypass was patent, the bilateral common iliac arteries were occluded and both posterior tibial arteries were occluded proximally with reconstitution of the distal posterior tibial arteries at the level of the ankle via collateralized flow arising at the bilateral distal peroneal arteries (*Id.* at p. 2).  Dr. Colburn determined from these diagnostic test results that Plaintiff was having significant problems with his previous aortobifemoral bypass (Exhibit E, Dkt. #13-6).  The right limb of the graft was out and the left limb had a proximal kink and a distal stenosis.

On March 2, 2006, Plaintiff underwent a bilateral femoral artery distal anastomotic thromboembolectomy, endarterectomies and patch angioplasties, retrograde graft thrombectomy, intraoperative arteriogram, bilateral graft limb opened, trans-catheter balloon angioplasty and stent, completion arteriogram, and subsequent left to right femoral-femoral bypass as a result of his lower extremity claudication, right lower extremity rest pain and malfunctioning of his previous aortobifemoral bypass graft (Exhibit G, Dkt. #13-8).

### 3.    *Vocational Evidence*

James Lozer served as the vocational expert (the "VE") in this matter (R. 327).  VE Lozer classified Plaintiff's past work as skilled and heavy exertional.  Plaintiff had no transferrable skills (R. 327-28).

12

ALJ Welsch asked VE Lozer to consider whether Plaintiff's past work could be performed by a hypothetical person who was limited to light and sedentary work and jobs that required no climbing or working at unprotected heights or prolonged walking (R. 327). VE Lozer testified that this hypothetical person could not perform Plaintiff's past work because it was all at the medium or heavy exertional level. ALJ Lozer then asked whether there were any unskilled, entry level work, that the hypothetical person could do (R. 328). VE Lozer offered the following jobs:

light unskilled: assembler (50,000), machine operators (20,000) and cashier (20,000);

sedentary unskilled: assembler (10,000), machine tenders (3,000) and general office clerk (3,000).

Changing the hypothetical to include an "extremely basic" ability to read would eliminate the clerical and cashier positions (R. 328-29). Adding the need for two scheduled 20-30 minute naps during the day would eliminate the production jobs, but VE Lozer indicated that there were telephone interviewer positions (4,000) and custodial positions (10,000) that could accommodate the scheduled naps (R. 330-31). The light custodial jobs would require lifting 20 pounds or less, minimal reaching and being on ones feet six out of eight hours (R. 333-34). The job could accommodate a 300 foot walking restriction (R. 334). Inability to climb stairs would reduce the number of light custodial jobs to 5,000. A sit/stand option for one half hour periods would eliminate all the custodial positions (R. 335). A need for unscheduled naps would eliminate competitive work (R. 331, 334).

### 4.  *The ALJ's Decision*

ALJ Welsch found that Plaintiff met the disability insured requirements of the Act through the date of the decision (R. 16).

Plaintiff's lumbar laminectomy and foraminotomy, history of aortobifemoral bypass surgery, mild osteoarthritis of the knees and history of arthroscopic surgery qualified as severe impairments (R. 17). The severity of the Plaintiff's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing").

ALJ Welsch found that Plaintiff's allegations regarding his limitations were not fully credible because the degree of pain and limitation alleged was not consistent with the objective medical evidence and his reported daily activities (R. 20). Regarding Plaintiff's credibility, ALJ Welsch found that Plaintiff's daily activities included watching television, working around the house, some laundry and dishes, occasionally grilling food, trips to gas station and convenience store, occasional travel out of town, visiting with his children regularly, mowing his yard with rests, smoking one and one half packs of cigarettes each day and the ability to care for his own personal hygiene.

ALJ Welsch discounted Plaintiff's treating physician, Dr. McNamara, because his "conclusion regarding the ultimate issue of disability" was "apparently based upon claimant's subjective statements" and was inconsistent with the findings on examination, level of treatment and daily activities, all of which indicated mild to moderate and not disabling symptoms.

ALJ Welsch found that Plaintiff had the residual functional capacity (RFC) to perform light and sedentary work with no climbing or work at unprotected heights and no prolonged walking (R. 20).

Plaintiff was unable to perform his past work and had no transferrable skills (R. 24-25). Although Plaintiff's limitations precluded him from performing a full range of light work, using the

14

Medical-vocational tables as a guideline and relying on VE Lozer's testimony regarding available jobs, VE Welsch determined that Plaintiff was not disabled (R. 25).

## II.   ANALYSIS

### A.   Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[4]  A response to a flawed hypothetical question is not

---

[4] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

15

substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.** **Factual Analysis**

In his motion for summary judgment Plaintiff argues that ALJ Welsch erred in: (a.) making an RFC determination that was contrary to the medical records and evidence, (b.) discounting Dr. McNamara's opinion and (d.) discounting Plaintiff's credibility. In his motion for remand for consideration of new evidence, Plaintiff argues that treatment, including surgery, received after the hearing date should be considered.

1.    Remand for New Evidence

On appeal, Plaintiff proffers evidence that on March 2, 2006, he underwent a bilateral femoral artery distal anastomic thromboembolectomy. The Commissioner argues that the new evidence signifies only a change in Plaintiff's condition subsequent to the hearing and is not indicative of Plaintiff's condition during the period covered by this application.

Such evidence to warrant a remand should be (1) new, (2) material, and (3) there should be a showing of good cause for a party's failure to include it in the record. 42 U.S.C. §405(g)[5]; *see, e.g.*, *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Evidence is 'material' if there is a reasonable possibility that the evidence would have changed the outcome of the administrative determination. *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981); *Huffer*,

---

[5] Sentence six of 42 U.S.C. § 405(g) provides:

The court . . .  may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

591 F. Supp. at 628.[6]

In this case, 'good cause' exists because claimant underwent surgery subsequent to the administrative hearing.

As the Commissioner points out, "[e]vidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial." *Wyatt v. Secretary of Health and Human Services* 974 F.2d 680, 685 (6th Cir. 1992)(citing *Sizemore*). Yet, in this case it is not clear whether or not Plaintiff was suffering from symptoms due to reocclusion at the time of the hearing or only after.

At the June 2003 DDS examination, almost two years prior to the hearing in this matter, Dr. Lazzara stated that Plaintiff "did have diminished pulsations in his right leg with diminished temperature indicative of possible re-occlusion" (R. 263). And, while it is true that Dr. Daniel

_____

[6] In *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988), the Sixth Circuit discusses the materiality standard of § 405(g):

> In order for the claimant to satisfy this burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. See Caroll v. Califano, 619 F.2d 1157, 1962 (6th Cir. 1980); see also Ward v. Schweiker, 686 F.2d 762, 764-65 (9th Cir. 1982); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981).

865 F.2d at 711. It is clear from reading *Sizemore* that the issue of the definition of "materiality" was not before the Sixth Circuit in that case. It also appears that the Sixth Circuit in *Sizemore* misstates the actual law in this and other circuits. None of the cases that it cites support the proposition that the materiality standard requires that there must be a "reasonable probability" of a different outcome. The case law focusing on this specific issue makes it clear that a lower standard of "reasonable possibility," and not "reasonable probability" applies for considering the materiality standard under 42 U.S.C. § 405(g). *See Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981) ("Thus we hold that a remand to the Secretary is not justified if there is no reasonable possibility that it would have changed the outcome of the Secretary's determination."); *Godsey v. Bowen*, 832 F.2d 443, 444 (7th Cir. 1987); *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987); *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987); Booz v. Secretary, 734 F.2d 1378, 1380-81 (9th Cir. 1984); *Dorsey v. Heckler*, 702 F.2d 597 (5th Cir. 1983).

Dolanski's 2003 Physical Residual Capacity Assessment provides support for the RFC determined by ALJ Welsch, this reviewer also did not have the benefit of the medical records subsequent to the hearing in which Plaintiff started to complain of increasing back pain and right leg pain and numbness, nor the diagnostic tests which show that Plaintiff's vascular surgery had malfunctioned at some point.

There is a reasonable possibility that ALJ Welsch would not have relied on the consultative physicians' reports had the record included the new evidence. Further, there is a reasonable possibility that ALJ Welsch's determination that Plaintiff's subjective complaints were not supported by the objective evidence may have been different had ALJ Welsch had the benefit of knowing that Plaintiff's previous vascular surgery had malfunctioned at some point. Therefore, it is recommended that this matter be remanded for consideration of the new evidence.

2.    Credibility Determination on Remand

Upon remand, the Commissioner should be ordered to evaluate Plaintiff's credibility more carefully, and in accordance with SSR 96-7p which notes that:

> the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is  necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

18

ALJ Welsch's found that Plaintiff's subjective complaint s of pain were not supported by his reported daily activities (R. 20).  Yet the daily activities ALJ Welsch described, working around the house, doing some laundry and dishes, visiting with children regularly, driving and mowing his yard, were all qualified by the Plaintiff during his testimony.  Plaintiff explained that he has mowed his lawn using a riding lawnmower and taking frequent breaks (R. 320), that he could put clothes in the washing machine but could  not switch them to the dryer or "anything else" (R. 318) and that he tried to do dishes if he was able to stand long enough to do them (R. 317).  Plaintiff also explained that he visited with his children when they came to him (R. 319).  Also, there does not appear to be any evidence in the record to support the contention that Plaintiff does work around the house.  In fact, Plaintiff and his wife repeatedly indicate in the application documents that he does not (R. 100- 107).

Therefore, on the current record, ALJ Welsch's credibility determination is not adequately supported.

### 3.    Treatment of Dr. McNamara's Opinion on Remand

ALJ Welsch's decision not to give Dr. McNamara's opinion controlling weight should not be overturned for two reasons.  First, Dr. McNamara's letter indicating that Plaintiff was disabled from full-time sedentary work purports to make a final disability determination, which is a subject left to the discretion of the ALJ.  Second, there is sufficient evidence in the record to support ALJ Welsch's finding that Dr. McNamara's opinion was not supported by the then-current record.

In 20 C.F.R. 404.1513(b) &(c) [SSI § 416.913 (b) &(c)] and SSR 96-5p the Commissioner distinguishes between a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" and the formal administrative finding on "residual functional capacity."  The former

19

is a physician's opinion on either physical or psychological capacities for work related activities.

The former, when based on the medical source's records, clinical and laboratory findings, and

examinations can be considered a "medical opinion" under § 404.1527(a)(2) [SSI § 416.913(a)(2)]

because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions"

are medical judgments about the nature and severity of [a claimant's] impairment(s)" and thus fall

within the Commissioner's definition of "medical opinion." Yet, because these medical opinions are

different from the formal findings under § 404.1527(e) [SSI § 416.913(e)] on "disability" and on

"residual functional capacity" – which are subjects reserved to the Commissioner and which may

be based on additional evidence in the record – the Commissioner need not defer to the treating

source opinion except in the narrow case where the treating source opinion is to be given controlling

weight under 20 C.F.R. §1527(d)(2) [§ 416.927(d)(2)], i.e. the treating sources' opinion is "well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in [the] case record."  Dr. McNamara did not provide

a determination about what Plaintiff could still do, but rather indicated that he felt that Plaintiff was

disabled – a determination left to the discretion of the Commissioner.

Further, in his letter Dr. McNamara's states that his opinion about Plaintiff's disability is

supported by Plaintiff's chronic back pain.  Yet, ALJ Welsch correctly pointed out that, subsequent

to Plaintiff's August 2001 back surgery, Dr. McNamara did not see Plaintiff again until June 2003

and only in his July 20, 2004, medical report is it noted that Plaintiff again complained of back pain.

Further, the July 20, 2004, record does not appear to support a disabling level of back pain, and Dr.

McNamara did not order any further diagnostic tests, physical therapy or daily activity restrictions.

Therefore, on the present record, ALJ Welsch's determination that Dr. McNamara's disability

determination would not be given controlling weight is supported.

Yet, even if a treating source's opinion is not given controlling weight, such an opinion is still entitled to some degree of deference, particularly if there is a long treating relationship as here, and that treating physician's opinion must be weighed using the factors in 20 C.F.R. §404.1527. S.S.R. 96-2p.  Also, to the extent that ALJ Welsch discounted Dr. McNamara's opinion due to its reliance on the credibility of Plaintiff's subjective statements, Plaintiff's credibility evaluation on remand may well be entitled to greater acceptance in light of the new evidence supporting the severity of his condition.  If this is the case, then the opinion of a treating physician who relied upon subjective symptoms may also be entitled to greater weight than was given to it after the first administrative hearing.

## III.   RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED, Plaintiff's Motion for Remand be GRANTED so that a determination can be made which includes consideration of the new evidence and Plaintiff's Motion for Summary Judgment be GRANTED IN PART with the Commissioner being instructed to perform a more thorough credibility determination in accordance with SSR 96-7p.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991).

Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.


Dated: January 31, 2007                              s/Steven D. Pepe
Flint, Michigan                                          United States Magistrate Judge


CERTIFICATE OF SERVICE

I hereby certify that on <u>January 31, 2007</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Janet L. Parker, AUSA, Wendy K. Bailey, Esq.</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>Social Security Administration, Office of the Regional Counsel, 200 W. Adams, 30th Floor, Chicago, IL 60606</u>

                              s/James P. Peltier
                              Courtroom Deputy Clerk
                              U.S.District Court
                              600 Church St.
                              Flint, MI 48502
                              810-341-7850
                              pete_peltier@mied.uscourts.gov